UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

     v.                                Case No. 22-CR-00035

BLESSING EGBON,

                Defendant.

---

## **PLEA AGREEMENT**

---

1.      The United States of America, by its attorneys, Richard G. Frohling, United States Attorney for the Eastern District of Wisconsin, and Gregory J. Haanstad, Assistant United States Attorney, and the defendant, Blessing Egbon, individually and by attorney Michelle L. Jacobs, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## **<u>CHARGES</u>**

2.      The defendant has been charged in three counts of a three-count Information, which alleges violations of Title 18, United States Code, Section 1343.

3.      The defendant has read and fully understands the charges contained in the Information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to each count set forth in the Information, a copy of which is attached to this plea agreement as Attachment A.

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in Attachment A. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts set forth in Attachment B. The defendant admits that those facts are true and correct and that they establish his guilt beyond a reasonable doubt. The facts set forth in Attachment B are provided for the purpose of setting forth a factual basis for the defendant's plea of guilty. Those facts are not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7.     The parties understand and agree that each of the offenses to which the defendant will enter a plea of guilty carries a maximum term of twenty years of imprisonment, a maximum fine of $250,000, and three years of supervised release. Each count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order will be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 29 of this agreement.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.     The parties understand and agree that, in order to sustain the wire fraud offense set forth in each respective count of the Information, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the defendant knowingly devised a scheme to defraud or to obtain money;

Second, that the defendant did so with the intent to defraud;

2

<u>Third</u>, that the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

<u>Fourth</u>, that for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place in the manner charged in the particular count.

## **SENTENCING PROVISIONS**

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in Attachment A.  The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in Counts One, Two, and Three is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

17.     The parties agree to recommend to the sentencing court that, because the loss from the offenses is more than $3,500,000, an 18-level increase under Sentencing Guidelines Manual § 2B1.1(b)(1)(J) is applicable to the offense level for the offenses charged in the Information.

18.     The parties agree to recommend to the sentencing court that, because the offenses involved ten or more victims, a two-level increase under Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i) is applicable to the offense level for the offenses charged in the Information.

4

19. The parties agree to recommend to the sentencing court that, because the offenses involved sophisticated means, a two-level increase under Sentencing Guidelines Manual § 2B1.1(b)(10)(C) is applicable to the offense level for the offenses charged in the Information.

20. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offenses prior to sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

### Sentencing Recommendations

21. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23. The government agrees to recommend that a sentence be imposed no greater than the bottom of the applicable sentencing guidelines range.

**Court's Determinations at Sentencing**

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

**FINANCIAL MATTERS**

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.  If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

27.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and

6

sworn financial statement on a form provided by FLU and any documentation required by the form.

**Special Assessment**

28.     The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

**Restitution**

29.     The defendant agrees to pay restitution as ordered by the court. The government will provide the victims' names and restitution amounts to the United States Probation Office and the Court prior to sentencing in this matter.  The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

**DEFENDANT'S WAIVER OF RIGHTS**

30.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

     a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

     b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government

7

establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth

8

Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## Further Civil or Administrative Action

34.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

35.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

36.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

37.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

9

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

39.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

10

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 02/01/2022

_____
BLESSING EGBON
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 2/1/2022

_____
MICHELLE L. JACOBS
Attorney for Defendant

For the United States of America:

Date: 2/2/2022

for _____
RICHARD G. FROHLING
United States Attorney

Date: 2/2/2022

_____
GREGORY J. HAANSTAD
Assistant United States Attorney

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,                Case No. 22-CR-

      v.                            [18 U.S.C. § 1343]

BLESSING K. EGBON,

                Defendant.

---

**INFORMATION**

---

**COUNTS ONE THROUGH THREE**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.     Beginning by approximately August of 2018, and continuing through at least July of 2020, in the State and Eastern District of Wisconsin and elsewhere,

**BLESSING K. EGBON,**

with intent to defraud, knowingly devised and executed a scheme to defraud investors and potential investors and to obtain money by means of materially false and fraudulent pretenses and representations, and knowingly caused wire communications to be transmitted in interstate commerce for the purpose of executing the scheme.

**Background**

2.     At all times relevant to this Information:

      a.     Blessing Egbon was the founder, the Chief Executive Officer, and the Chairman of the Board of Directors of Exit 7c, Inc. (Exit 7c).

      b.     Exit 7c, which formerly had been known as Coop Fuel, was a corporation registered in the State of Delaware and headquartered in Milwaukee, Wisconsin.

      c.     Exit 7c was in the business of selling both bulk fuel and onsite fuel and maintenance services to trucking companies, rental car agencies, and other

transportation companies that operated fleets of vehicles.

**The Scheme to Defraud**

3. Beginning by approximately August 2018, Egbon solicited potential investors and induced them to invest in Exit 7c based on materially false and fraudulent pretenses and representations. As a result, Egbon obtained in excess of $6 million from eleven investors, as reflected in the table below.

| Date | Investor | Amount |
|------|----------|--------|
| August 1, 2018 | INVESTOR #1 | $ 200,000.00 |
| August 10, 2018 | INVESTOR #2 | $ 75,000.00 |
| August 20, 2018 | INVESTOR #3 | $ 50,000.00 |
| August 22, 2018 | INVESTOR #4 | $ 50,000.00 |
| August 23, 2018 | INVESTOR #5 | $ 100,000.00 |
| August 29, 2018 | INVESTOR #6 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #7 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #8 | $ 100,000.00 |
| September 25, 2018 | INVESTOR #9 | $ 100,000.00 |
| June 6, 2019 | INVESTOR #10 | $ 500,000.53 |
| March 18, 2020 | INVESTOR #11 | $ 4,999,998.39 |
| | Total: | $ 6,274,998.92 |

4. In soliciting these investments, Egbon knowingly and intentionally made materially false statements and representations about, among other things, the nature and extent of his prior business and entrepreneurial experience. Egbon claimed to have been involved with certain business entities when, in reality, the entities were entirely fictitious. In other instances, Egbon exaggerated the role that he had played in businesses that did exist.

5. Egbon also made materially false representations and statements to investors and potential investors regarding Exit 7c's revenue, profits, growth, volume of business, and overall financial performance. Egbon supported those misrepresentations and false statements with false and fraudulent documents, including profit-and-loss statements, balance sheets, income statements,

2

tax documents, and bank statements. Egbon provided such documents to investors and potential

investors knowing and intending that they would rely on the false information when making their

investment decisions.

6.     Egbon regularly and repeatedly reported false monthly revenue figures to investors

and potential investors. He falsely represented that, for the sixteen-month period from September of

2018 through December of 2019, Exit 7c had total sales revenue of more than $91 million. In fact,

Exit 7c's total sales revenue for that period was approximately $348,562. A partial summary of

Egbon's misrepresentations and false statements regarding Exit 7c's revenue is provided in the table

below.

| | | Sales Revenue by Month | | |
| | | Representation to Investors | Exit 7c Internal Accounting | Exit 7c Bank Records |
|---|---|---|---|---|
| 2018 | September | $ 4,443,958 | $ 22,560 | $ 1,968 |
| | October | $ 4,729,375 | $ 23,176 | $ 30,696 |
| | November | $ 4,939,024 | $ 25,274 | $ 27,228 |
| | December | $ 5,067,228 | $ 20,653 | $ 20,030 |
| 2019 | January | $ 5,466,260 | $ 34,223 | $ 28,724 |
| | February | $ 5,518,765 | $ 19,150 | $ 15,702 |
| | March | $ 5,521,167 | $ 14,617 | $ 20,868 |
| | April | $ 5,874,178 | $ 13,213 | $ 37,367 |
| | May | $ 5,925,678 | $ 13,986 | $ 18,893 |
| | June | $ 6,122,189 | $ 12,118 | $ 10,986 |
| | July | $ 6,128,157 | $ 16,400 | $ 14,914 |
| | August | $ 6,132,752 | $ 28,309 | $ 11,566 |
| | September | $ 6,365,140 | $ 34,077 | $ 19,378 |
| | October | $ 6,244,595 | $ 37,126 | $ 34,113 |
| | November | $ 6,280,053 | $ 19,994 | $ 33,869 |
| | December | $ 6,281,328 | $ 13,686 | $ 16,947 |
| | | $ 91,039,847 | $ 348,562 | $ 343,249 |

7.     Egbon also made material misrepresentations to investors and potential investors

regarding his past, present, and future use of investor funds. In or about October of 2019, Egbon

3

falsely claimed to investors and potential investors that Exit 7c was acquiring seven different operational businesses. Egbon identified the businesses by name, listed false revenue, profit, and other financial information for the businesses, and laid out the terms of purportedly accepted offers. The businesses in fact had not agreed to the acquisition terms listed by Egbon, and were unaware that he was misrepresenting their financial information to potential investors. Egbon never acquired any of the businesses that he claimed he had. In fact, at the times he represented that he had acquired the businesses, Egbon and Exit 7c did not have sufficient funds to have satisfied the purported purchase terms.

8. In or about November of 2019, Egbon falsely represented to current and potential future investors that he would use new investor money to make the following purchases:

| Purchase | Cost |
|---|---|
| 60 Oil Change Vans | $ 723,900 |
| 90 Car Wash Vans | $ 1,057,500 |
| 24 Bulk Fuel Trucks | $ 1,320,000 |
| | $ 3,101,400 |

Egbon never made any of those purchases.

9. In addition to specific false representations that he made regarding the use of investor money, Egbon also represented more generally that he would use newly invested money "to expand capabilities within existing markets, further develop technology capabilities, hire key management team members, and for general working capital purposes and general corporate expenses."

10. Rather than use investor money for these legitimate business purposes, as he had represented to investors and potential investors that he would, Egbon instead used the fraudulently obtained funds largely for personal purposes, including visits to luxury nightclubs, flights on private

4

chartered jets, villa rentals, and payments to himself.

11.     Among Egbon's personal expenditures of investor money were those set forth in the

table below:

| Date | Payee | Location | Description | Amount |
|------|-------|----------|-------------|--------|
| November 5, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 16,491 |
| November 13, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 14,188 |
| August 5, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 13,996 |
| August 12, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 10,764 |
| September 16, 2019 | XS - ENCORE | LAS VEGAS, NV | NIGHTCLUB AND RESTAURANT | $ 11,411 |
| March 24, 2020 | SENTIENT JET CHARTER | | PRIVATE JET CHARTER | $ 26,095 |
| April 6, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 22,500 |
| April 9, 2020 | XO GLOBAL LLC | | PRIVATE JET CHARTER | $ 24,950 |
| April 21, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 20,000 |

## Execution of the Scheme

12.     On or about the dates listed below, for the purpose of executing the above-described

scheme to defraud, and attempting to do so, in the State and Eastern District of Wisconsin and

elsewhere, Egbon caused the following wire communications to be transmitted in interstate

commerce:

| Count | Date | Description |
|-------|------|-------------|
| One | October 15, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that Exit 7c had $6.36 million in gross revenue in September 2019. |
| Two | October 23, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that he had purchased seven specifically identified businesses. |
| Three | June 25, 2020 | Email from Egbon to Investor #11, in which Egbon falsely represented that Exit 7c had $13,739,277.44 in cash on-hand as of the end of May 2020. |

All in violation of Title 18, United States Code, Section 1343.

RICHARD G. FROHLING
United States Attorney

_____
Date

## ATTACHMENT B

### Background

Blessing Egbon founded Exit 7c, Inc., in 2017. He registered the business as a corporation in Delaware and headquartered it in Milwaukee, Wisconsin. Through Exit 7c and its predecessor company, Co-op Fuel, Inc., Egbon was in the business of selling both bulk fuel and onsite fuel and maintenance services to trucking companies, rental car agencies, and other transportation companies that operated fleets of vehicles.

Egbon was both Chief Executive Officer and Chairman of the Board of Directors of Exit 7c, beginning with his founding of the company in 2017 and continuing until July of 2020. In those various roles, Egbon had a number of responsibilities, including managing Exit 7c's finances, soliciting new investors, and keeping investors and the Board of Directors informed as to the company's operations and financial performance. Egbon also was the only person authorized to write checks and otherwise make payments from Exit 7c's bank accounts.

### Egbon's Fraud Scheme

By no later than August of 2018, Egbon had devised and was executing a fraud scheme in which he repeatedly made materially false and fraudulent statements and representations to existing investors and potential new investors as to (1) his background, experience, and qualifications; (2) the performance and financial health of Exit 7c; and (3) how investor money would be used. Egbon intended these false statements to deceive investors and potential investors and to cause them to make new investments or to maintain existing investments.

Egbon obtained a total of at least $6,274,998.92 from those victim investors, as reflected in the table below.

| Date | Investor | Amount |
|---|---|---|
| August 1, 2018 | INVESTOR #1 | $ 200,000.00 |
| August 10, 2018 | INVESTOR #2 | $ 75,000.00 |
| August 20, 2018 | INVESTOR #3 | $ 50,000.00 |
| August 22, 2018 | INVESTOR #4 | $ 50,000.00 |
| August 23, 2018 | INVESTOR #5 | $ 100,000.00 |
| August 29, 2018 | INVESTOR #6 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #7 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #8 | $ 100,000.00 |
| September 25, 2018 | INVESTOR #9 | $ 100,000.00 |
| June 6, 2019 | INVESTOR #10 | $ 500,000.53 |
| March 18, 2020 | INVESTOR #11 | $ 4,999,998.39 |
| | Total: | $ 6,274,998.92 |

<u>Materially False and Fraudulent Pretenses and Representations</u>

*1. Materially false representations regarding Egbon's background and experience*

Some of Egbon's materially false statements related to his background and experience. Egbon falsely claimed to have been involved with certain businesses which, in reality, were entirely fictitious. He also exaggerated the role that he had played in certain businesses that did exist. Egbon intended his falsely padded resume to deceive investors and potential investors and to cause them to make investments in Exit 7c.

*2. Materially false representations regarding Exist 7c's finances and performance*

Egbon also made materially false and fraudulent statements and representations regarding Exit 7c's financial health and performance. Egbon made extensive use of altered and otherwise false and fraudulent documents to further this aspect of his scheme. Among those documents were doctored bank statements, false financial statements, and false tax documents.

Egbon made false monthly reports to investors and potential investors regarding Exit 7c's sales revenue. For example, on July 7, 2019, in an interstate wire communication – specifically, an email to investors and potential investors, Egbon falsely represented that Exit 7c had more

than $6.1 million in sales revenue in June 2019. Exit 7c's own internal accounting showed only $12,118 in sales revenue that month, and the company's bank records reflected only $10,986. Similarly, on October 15, 2019, in an interstate wire communication – specifically, an email to investors and potential investors – Egbon falsely represented that Exit 7c had more than $6.3 million in sales revenue in September 2019. Exit 7c's own internal accounting showed only $34,077 in sales revenue that month, and its bank records reflected only $19,378.

During the course of his fraud scheme, Egbon represented to investors and potential investors that, for the sixteen-month period from September of 2018 through December of 2019, Exit 7c had total sales revenue of more than $91 million. In fact, Exit 7c's total sales revenue for that period was between $343,249 and $348,562, more than $90 million short of what Egbon had falsely represented. A partial summary of Egon's materially false representations and pretenses regarding Exit 7c's revenue is provided in the table below.

| | | Sales Revenue by Month | | |
|---|---|---|---|---|
| | | Representation to Investors | Exit 7c Internal Accounting | Exit 7c Bank Records |
| 2018 | September | $ 4,443,958 | $ 22,560 | $ 1,968 |
| | October | $ 4,729,375 | $ 23,176 | $ 30,696 |
| | November | $ 4,939,024 | $ 25,274 | $ 27,228 |
| | December | $ 5,067,228 | $ 20,653 | $ 20,030 |
| 2019 | January | $ 5,466,260 | $ 34,223 | $ 28,724 |
| | February | $ 5,518,765 | $ 19,150 | $ 15,702 |
| | March | $ 5,521,167 | $ 14,617 | $ 20,868 |
| | April | $ 5,874,178 | $ 13,213 | $ 37,367 |
| | May | $ 5,925,678 | $ 13,986 | $ 18,893 |
| | June | $ 6,122,189 | $ 12,118 | $ 10,986 |
| | July | $ 6,128,157 | $ 16,400 | $ 14,914 |
| | August | $ 6,132,752 | $ 28,309 | $ 11,566 |
| | September | $ 6,365,140 | $ 34,077 | $ 19,378 |
| | October | $ 6,244,595 | $ 37,126 | $ 34,113 |
| | November | $ 6,280,053 | $ 19,994 | $ 33,869 |
| | December | $ 6,281,328 | $ 13,686 | $ 16,947 |
| | | $ 91,039,847 | $ 348,562 | $ 343,249 |

*3. Materially false representations and pretenses regarding use of investor funds*

Egbon made materially false representations to investors and potential investors regarding his past, present, and future use of investor funds. For example, in an October 23, 2019, interstate wire communication – specifically, an email to investors and potential investors – Egbon falsely represented that Exit 7c was acquiring seven different operational businesses. Egbon not only identified the businesses by name, but he also provided investors with false revenue, profit, and other financial information for the businesses and laid out the terms of offers that he represented had been accepted. The businesses in fact had not agreed to the terms as Egbon had represented they had, and Egbon never acquired any of the businesses. Egbon did not have the funds available to have satisfied the purchase terms he identified.

4

In November 2019, Egbon falsely represented to current and potential investors that he would use new investor money to make the following purchases, among others:

| Purchase | Cost |
|---|---|
| 60 Oil Change Vans | $ 723,900 |
| 90 Car Wash Vans | $ 1,057,500 |
| 24 Bulk Fuel Trucks | $ 1,320,000 |
| | $ 3,101,400 |

Egbon never made any of those purchases.

In addition to these and other specific false representations that he made regarding the use of investor funds, Egbon also represented more generally that he would use newly invested money "to expand capabilities within existing markets, further develop technology capabilities, hire key management team members, and for general working capital purposes and general corporate expenses."

Rather than use investor money for these legitimate purposes, as he had represented to investors and potential investors that he would, Egbon instead used the fraudulently obtained funds largely for personal purposes, including visits to luxury nightclubs, flights on private chartered jets, villa rentals, and payments to himself. Among Egbon's personal expenditures of investor money were the following:

| Date | Payee | Location | Description | Amount |
|---|---|---|---|---|
| November 5, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 16,491 |
| November 13, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 14,188 |
| August 5, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 13,996 |
| August 12, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 10,764 |
| September 16, 2019 | XS - ENCORE | LAS VEGAS, NV | NIGHTCLUB AND RESTAURANT | $ 11,411 |
| March 24, 2020 | SENTIENT JET CHARTER | | PRIVATE JET CHARTER | $ 26,095 |
| April 6, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 22,500 |
| April 9, 2020 | XO GLOBAL LLC | | PRIVATE JET CHARTER | $ 24,950 |
| April 21, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 20,000 |

Egbon regularly caused wire communications to be transmitted in interstate commerce for the purpose of executing his fraud scheme in the State and Eastern District of Wisconsin and elsewhere. Among those interstate wire communications were the following:

| Count | Date | Description |
|-------|------|-------------|
| One | October 15, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that Exit 7c had $6.36 million in gross revenue in September 2019. |
| Two | October 23, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that he had purchased seven specifically identified businesses. |
| Three | June 25, 2020 | Email from Egbon to Investor #11, in which Egbon falsely represented that Exit 7c had $13,739,277.44 in cash on-hand as of the end of May 2020. |

6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,                Case No. 22-CR-

    v.                                 [18 U.S.C. § 1343]

BLESSING K. EGBON,

                Defendant.

---

## INFORMATION

---

### COUNTS ONE THROUGH THREE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.     Beginning by approximately August of 2018, and continuing through at least July of 2020, in the State and Eastern District of Wisconsin and elsewhere,

**BLESSING K. EGBON,**

with intent to defraud, knowingly devised and executed a scheme to defraud investors and potential investors and to obtain money by means of materially false and fraudulent pretenses and representations, and knowingly caused wire communications to be transmitted in interstate commerce for the purpose of executing the scheme.

### Background

2.     At all times relevant to this Information:

    a.     Blessing Egbon was the founder, the Chief Executive Officer, and the Chairman of the Board of Directors of Exit 7c, Inc. (Exit 7c).

    b.     Exit 7c, which formerly had been known as Coop Fuel, was a corporation registered in the State of Delaware and headquartered in Milwaukee, Wisconsin.

    c.     Exit 7c was in the business of selling both bulk fuel and onsite fuel and maintenance services to trucking companies, rental car agencies, and other

transportation companies that operated fleets of vehicles.

**The Scheme to Defraud**

3.      Beginning by approximately August 2018, Egbon solicited potential investors and induced them to invest in Exit 7c based on materially false and fraudulent pretenses and representations. As a result, Egbon obtained in excess of $6 million from eleven investors, as reflected in the table below.

| Date | Investor | Amount |
|---|---|---|
| August 1, 2018 | INVESTOR #1 | $ 200,000.00 |
| August 10, 2018 | INVESTOR #2 | $ 75,000.00 |
| August 20, 2018 | INVESTOR #3 | $ 50,000.00 |
| August 22, 2018 | INVESTOR #4 | $ 50,000.00 |
| August 23, 2018 | INVESTOR #5 | $ 100,000.00 |
| August 29, 2018 | INVESTOR #6 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #7 | $ 50,000.00 |
| September 11, 2018 | INVESTOR #8 | $ 100,000.00 |
| September 25, 2018 | INVESTOR #9 | $ 100,000.00 |
| June 6, 2019 | INVESTOR #10 | $ 500,000.53 |
| March 18, 2020 | INVESTOR #11 | $ 4,999,998.39 |
| | Total: | $ 6,274,998.92 |

4.      In soliciting these investments, Egbon knowingly and intentionally made materially false statements and representations about, among other things, the nature and extent of his prior business and entrepreneurial experience. Egbon claimed to have been involved with certain business entities when, in reality, the entities were entirely fictitious. In other instances, Egbon exaggerated the role that he had played in businesses that did exist.

5.      Egbon also made materially false representations and statements to investors and potential investors regarding Exit 7c's revenue, profits, growth, volume of business, and overall financial performance. Egbon supported those misrepresentations and false statements with false and fraudulent documents, including profit-and-loss statements, balance sheets, income statements,

2

tax documents, and bank statements. Egbon provided such documents to investors and potential

investors knowing and intending that they would rely on the false information when making their

investment decisions.

6.      Egbon regularly and repeatedly reported false monthly revenue figures to investors

and potential investors. He falsely represented that, for the sixteen-month period from September of

2018 through December of 2019, Exit 7c had total sales revenue of more than $91 million. In fact,

Exit 7c's total sales revenue for that period was approximately $348,562. A partial summary of

Egbon's misrepresentations and false statements regarding Exit 7c's revenue is provided in the table

below.

| | | Sales Revenue by Month | | |
|---|---|---|---|---|
| | | Representation to Investors | Exit 7c Internal Accounting | Exit 7c Bank Records |
| 2018 | September | $ 4,443,958 | $ 22,560 | $ 1,968 |
| | October | $ 4,729,375 | $ 23,176 | $ 30,696 |
| | November | $ 4,939,024 | $ 25,274 | $ 27,228 |
| | December | $ 5,067,228 | $ 20,653 | $ 20,030 |
| 2019 | January | $ 5,466,260 | $ 34,223 | $ 28,724 |
| | February | $ 5,518,765 | $ 19,150 | $ 15,702 |
| | March | $ 5,521,167 | $ 14,617 | $ 20,868 |
| | April | $ 5,874,178 | $ 13,213 | $ 37,367 |
| | May | $ 5,925,678 | $ 13,986 | $ 18,893 |
| | June | $ 6,122,189 | $ 12,118 | $ 10,986 |
| | July | $ 6,128,157 | $ 16,400 | $ 14,914 |
| | August | $ 6,132,752 | $ 28,309 | $ 11,566 |
| | September | $ 6,365,140 | $ 34,077 | $ 19,378 |
| | October | $ 6,244,595 | $ 37,126 | $ 34,113 |
| | November | $ 6,280,053 | $ 19,994 | $ 33,869 |
| | December | $ 6,281,328 | $ 13,686 | $ 16,947 |
| | | $ 91,039,847 | $ 348,562 | $ 343,249 |

7.      Egbon also made material misrepresentations to investors and potential investors

regarding his past, present, and future use of investor funds. In or about October of 2019, Egbon

3

falsely claimed to investors and potential investors that Exit 7c was acquiring seven different

operational businesses. Egbon identified the businesses by name, listed false revenue, profit, and

other financial information for the businesses, and laid out the terms of purportedly accepted offers.

The businesses in fact had not agreed to the acquisition terms listed by Egbon, and were unaware

that he was misrepresenting their financial information to potential investors. Egbon never acquired

any of the businesses that he claimed he had. In fact, at the times he represented that he had

acquired the businesses, Egbon and Exit 7c did not have sufficient funds to have satisfied the

purported purchase terms.

8.      In or about November of 2019, Egbon falsely represented to current and potential

future investors that he would use new investor money to make the following purchases:

| Purchase | Cost |
|---|---|
| 60 Oil Change Vans | $    723,900 |
| 90 Car Wash Vans | $  1,057,500 |
| 24 Bulk Fuel Trucks | $  1,320,000 |
|  | $  3,101,400 |

Egbon never made any of those purchases.

9.      In addition to specific false representations that he made regarding the use of

investor money, Egbon also represented more generally that he would use newly invested money

"to expand capabilities within existing markets, further develop technology capabilities, hire key

management team members, and for general working capital purposes and general corporate

expenses."

10.     Rather than use investor money for these legitimate business purposes, as he had

represented to investors and potential investors that he would, Egbon instead used the fraudulently

obtained funds largely for personal purposes, including visits to luxury nightclubs, flights on private

4

chartered jets, villa rentals, and payments to himself.

11. Among Egbon's personal expenditures of investor money were those set forth in the table below:

| Date | Payee | Location | Description | Amount |
|------|-------|----------|-------------|--------|
| November 5, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 16,491 |
| November 13, 2018 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 14,188 |
| August 5, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 13,996 |
| August 12, 2019 | TAO CHICAGO | CHICAGO, IL | NIGHTCLUB AND RESTAURANT | $ 10,764 |
| September 16, 2019 | XS - ENCORE | LAS VEGAS, NV | NIGHTCLUB AND RESTAURANT | $ 11,411 |
| March 24, 2020 | SENTIENT JET CHARTER | | PRIVATE JET CHARTER | $ 26,095 |
| April 6, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 22,500 |
| April 9, 2020 | XO GLOBAL LLC | | PRIVATE JET CHARTER | $ 24,950 |
| April 21, 2020 | LA CASA CON VISTA | SCOTTSDALE, AZ | RENTAL VILLAS | $ 20,000 |

## Execution of the Scheme

12. On or about the dates listed below, for the purpose of executing the above-described scheme to defraud, and attempting to do so, in the State and Eastern District of Wisconsin and elsewhere, Egbon caused the following wire communications to be transmitted in interstate commerce:

| Count | Date | Description |
|-------|------|-------------|
| One | October 15, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that Exit 7c had $6.36 million in gross revenue in September 2019. |
| Two | October 23, 2019 | Email from Egbon to investors and potential investors, in which Egbon falsely represented that he had purchased seven specifically identified businesses. |
| Three | June 25, 2020 | Email from Egbon to Investor #11, in which Egbon falsely represented that Exit 7c had $13,739,277.44 in cash on-hand as of the end of May 2020. |

All in violation of Title 18, United States Code, Section 1343.

RICHARD G. FROHLING
United States Attorney

Date